UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
DENAM HALL,                                    :

                        Petitioner,            :          **REPORT AND RECOMMENDATION**

                -against-                      :                03 Civ. 4830 (KMK)(KNF)

FRANK MCCRAY, JR.,                             :

                        Respondent.            :
-----------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

Before the Court is Denam Hall's ("Hall") petition for a writ of habeas corpus made

pursuant to 28 U.S.C. § 2254. Hall alleges that his confinement by New York state is unlawful

because: (1) the trial court violated his rights to due process and equal protection under the law

by denying his application made pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712

(1986)[1] where the prosecutor failed to demonstrate a non-pretextual, race-neutral reason for

excluding, through the use of peremptory challenges, two Hispanics from the jury that convicted

him; and (2) the trial court erred when it removed a sworn juror over trial counsel's objection,

thereby denying the petitioner the right to have a voice in choosing his jury.

The respondent opposes Hall's application for habeas corpus relief. He contends that the

state appellate court's determination that the trial court denied properly Hall's Batson challenge

was not contrary to, or an unreasonable application of, Supreme Court precedent. The

respondent contends further that Hall's second claim is unexhausted, but should be deemed

---

[1] In Batson, the Supreme Court made clear that the Equal Protection Clause of the Constitution
bars a prosecutor from challenging venire members solely on account of their race.

exhausted and procedurally barred.  Alternatively, the respondent contends that this claim is without merit.

## II.  BACKGROUND

On December 17, 1999, police officers from the New York City Police Department's 32nd Precinct Street Narcotics Enforcement Unit ("Unit") conducted an observation post operation from the rooftop of the building located at 109 West 129th Street in Manhattan.  The Unit consisted of Sergeant Michael Vega ("Vega"), and Police Officers John Thomas ("Thomas"), Edward Pressley ("Pressley"), Telly Waring ("Waring"), Gamble ("Gamble") and Nancy Palermo ("Palermo").  Officers Thomas and Gamble observed the street from the rooftop while Sgt. Vega and Officer Palermo comprised one "apprehension team" on the ground and Officers Pressley and Waring comprised the other.

At approximately 1:00 p.m. on the date in question, Officer Thomas observed Hall, who was standing in front of the building located at 9 West 129th Street, engage in a conversation with Ernest Fell ("Fell").  9 West 129th Street is located less than 530 feet from elementary school P. S. 133.  After a brief conversation, Fell gave Hall a sum of money.  Hall walked to a Jeep that was parked along the curb and squatted down next to it.  A few minutes later, Hall returned to where Fell was standing and handed him what appeared to be several small objects. Fell then left the area and walked east toward Fifth Avenue, where he made a left turn and headed north toward West 130th Street.  Officers Pressley and Waring then apprehended Fell and recovered three small blue zip-lock bags.

Shortly thereafter, Officer Thomas observed Hall engage in the same behavior with Kurtis Smith ("Smith").  As had occurred with Fell, Smith gave Hall a quantity of money and received "small objects" in return.  Smith then entered his automobile and began to drive away.

Smith was subsequently stopped and apprehended by Sgt. Vega and Officer Waring between Lenox and Fifth Avenues. The officers recovered one small blue zip-lock bag of crack cocaine from Smith.

Sgt. Vega and Officer Palermo then proceeded to 9 West 129th Street where Sgt. Vega handcuffed Hall and recovered $98 from his pants pocket. Officer Palermo located a brown paper bag at the spot where Hall had bent down next to the Jeep. Inside the paper bag was a clear plastic bag containing six small blue zip-lock bags of crack cocaine.

By New York County Indictment Number 9673/99, Hall was charged with two counts of criminal sale of a controlled substance in or near school grounds (N.Y. Penal Law § 220.44[2]), two counts of criminal sale of a controlled substance in the third degree (N.Y. Penal Law § 220.39[1]), and one count of criminal possession of a controlled substance in the third degree (N.Y. Penal Law § 220.16[1]).

Jury selection for petitioner's trial commenced on March 23, 2000, and was conducted in two rounds. During the first round, twenty prospective jurors were questioned, including Anna Cabrera ("Cabrera"). Cabrera, responding to a written questionnaire provided by the court, stated that she had lived in Manhattan for nine years, had a degree in liberal arts and was employed as a health home aid. Cabrera also stated that she was married, had three children of her own and one stepson, had never served on a jury and did not have any close friends who worked for a law enforcement agency. Cabrera stated further that she had never been the victim of a crime, and had never been arrested or convicted for a crime. Thereafter, the prosecutor informed Cabrera that she would "learn that this case involves a small amount of drugs being exchanged" and asked whether she thought this would influence her verdict. Cabrera assured the prosecutor that if the evidence proved guilt beyond a reasonable doubt, she would be able to find

the defendant guilty. Cabrera was also asked whether she thought police officers always told the truth when they testified. Cabrera stated that she did not know.

Before the conclusion of the first round of <u>voir dire</u>, another prospective juror, Elsie Calderone ("Calderone"), was called to replace a juror who had been excused for cause. Calderone provided the following information in response to the trial court's questionnaire:

> My name is Elsie Calderone. I live in Washington [H]eights. . . . . I have [a] BS degree in communications. I work for a graduate school, marital status is single, no children. I have [not] served on a civil[,] criminal[,] or grand jury. I don't have any relatives or close friends in any law enforcement agency, and I spend my spare time reading and traveling also.

Calderone also stated that she had never been arrested or convicted for a crime and had never been the victim of a crime. When asked by the prosecutor whether she believed that "we are fighting a losing war in the drug battle," Calderone replied, "Yes. . . . They are still around. We're still fighting the same war. We have just taken different approaches."

At the conclusion of the first round of <u>voir dire</u>, at counsel to petitioner's request, one prospective juror from among the first twelve questioned was excused for cause. The prosecutor then exercised three peremptory challenges seeking to exclude Cabrera, Calderone and prospective juror Howard Knowes. Thereafter, counsel to the petitioner made an application premised upon <u>Batson</u>. In making his application, counsel to the petitioner cited the prosecutor's attempt to exclude "the two Hispanic jurors"[2] from the panel. The following exchange then took place:

> [COUNSEL TO PETITIONER]: [There are] two Hispanic female[s] on the panel and . . . he struck both of them. I don't think [there] is a race neutral reason [for] striking Ms. Calderone. She said she could be fair.

---

[2]Although counsel to the petitioner refers to "Hispanic jurors," the record in this case offers no basis for determining with certainty the ethnicity of either Cabrera or Calderone.

[ASSISTANT DISTRICT ATTORNEY ("ADA")]: You want to hear me?

THE COURT: The Bats[o]n challenge require[s] you to offer [a] race neutral explanation for each of those two jurors.

[ADA]: Sure. . . . Your Honor, my understanding of Bats[o]n, if [the] defense attorney laid out a proper foundation, I believe that the prosecution was striking people for inappropriate reasons.

THE COURT: All counsel has offered as a reason, they are [the] only two Hispanics in the first 12.

[ADA]: I have no problem answering the questions.

THE COURT: You challenged – actually there may be more than two Hispanics but that's the challenge.

The prosecutor went on to explain, with respect to Cabrera, that "she said she was afraid of convicting the wrong guy."[3] The prosecutor continued: "When people speak up and say that, I don't feel I want them on the jury." As to Calderone, the prosecutor stated: "It has nothing to do with her race. Just didn't get a good feel from her response." The trial judge then directed the prosecutor to "be more specific" with respect to Calderone and to "examine your notes." The prosecutor offered the following explanation:

She is single, she has no kids. . . . Her answers to my questions when I directed a question to her, she seem[ed] to hesitate. . . . I thought she was wondering what she should say. It was somewhat of a gut call in striking her and I think I'm entitled to do that at this early stage of the process without having to explain more than that.

---

[3] At the beginning of voir dire, prior to individual questioning, three unnamed jurors responded to the court's query regarding the jurors' religious beliefs and whether these would prevent the jurors from "sitting in judgment of another person and voting guilty or not guilty of the charged crime." The explanation given by the prosecutor for striking Cabrera suggests that she was one of the three who responded to that query. The transcript of the proceedings indicates only that a "juror" stated that she had no religious beliefs but was "scared of convicting the wrong person."

Counsel to the petitioner, after conferring with the trial judge, withdrew his Batson challenge with respect to Cabrera, but reasserted his challenge with respect to Calderone. Thereafter, the trial judge denied petitioner's application, made pursuant to Batson, stating that it was "too early . . . to make a determination as to a pattern of exclusion by race." Furthermore, the trial judge stated, "[t]he District Attorney has articulated a response which is more instinctual to this particular woman, and, I don't discern any race bias in that at this point in time because those . . . feelings could be applied to any witness [sic] whether male or female of another race."

Edith Carlo ("Carlo") was also examined during the first round of voir dire. Prior to questioning the prospective jurors individually, the trial court directed certain general questions to the panel as a whole. One of the questions put to the jurors was whether anyone had "a health problem that would be jeopardized by service on a jury or would interfere with your ability to serve on the jury?" The jurors were also asked whether they had "any mental or physical condition" that would prevent them from serving on the jury and whether they were taking "any medication that would make it difficult to concentrate or otherwise be attentive during proceedings or during deliberations?" Although several jurors chose to respond affirmatively to these questions, it does not appear from a review of the record that Carlo was among them. Additionally, there is no indication in the record that Carlo responded to the questions posed through the court's written questionnaire. Nevertheless, at the conclusion of this stage of the jury selection process, Carlo was one of nine jurors selected.

On March 27, 2000, prior to the continuation of trial, Carlo stated that she wished to inform the court that: (a) she was a diabetic who was taking medication; and (b) she had "had a past experience with a case like this." Carlo explained that, because of her diabetic condition, she was required to take an insulin pill once a day. Carlo stated that she had "skipped [her]

6

dose" on the day that she had appeared previously for jury selection and that, as a result, her blood sugar had dropped significantly by the time she returned home. When asked by the trial court what happened to her when her blood sugar was low, Carlo replied, "I get nervous, I can't concentrate and, actually, you know, it will interrupt the case if I have to, sir." Carlo stated further that her inability to concentrate was the reason she had not brought her medical condition or the matter of her earlier experience with a similar case to the attention of the court during voir dire.

When asked by the prosecutor about her previous experience with a similar case, Carlo stated that it was a case involving a "controlled substance" and a close friend of hers who had been "involved with drugs." She also stated that the prospect of serving on a jury in the present case affected her because it "brings back flashes to me of the past of someone I know." Counsel to the petitioner then inquired whether her previous experience would affect her ability to be "fair with someone who is accused of selling drugs." Carlo replied, "no," and went on to say that "[i]t just gets me nervous and brings back flashes to me." Carlo was then excused from the courtroom.

During colloquy, the prosecutor stated that he would consent to Carlo's removal from the jury panel. Counsel to the petitioner, however, declined to consent to Carlo's removal. The court, noting that Carlo was a sworn juror, then determined to consider whether Carlo was "grossly unqualified" to serve on the jury pursuant to New York Criminal Procedure Law ("CPL") § 270.35.[4] The prosecutor expressed his concern that Carlo's medical condition would

---

[4] CPL § 270.35 provides, in pertinent part:

> If at any time after the trial jury has been sworn and before the rendition of its verdict, a juror is unable to continue serving by reason of illness or other incapacity, or for any other reason is unavailable for continued service, or the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case or has engaged in misconduct of a

(continued...)

prevent her from paying attention during trial and also observed that Carlo may have lied to the court during voir dire when she denied knowing anyone who had been arrested. The prosecutor explained that his notes reflected that Carlo previously indicated that she didn't know anybody who was a victim of a crime or had been arrested. The trial judge disagreed, stating that his "recollection was that she said she knew someone under a drug circumstance, not that they were ever arrested." The prosecutor again disputed this assertion and requested that further questioning of Carlo take place. The trial judge then instructed that Carlo be brought back into the courtroom and the following exchange took place:

> THE COURT: Miss Carlo, we want to ask you a couple of more questions. When you said that you knew someone in a similar – somebody involved with drugs, I think you told us earlier, could you tell us a little more about that without naming any names? What was that all about?
>
> [CARLO]: Well, the person did time.
>
> THE COURT: I'm sorry?
>
> [CARLO]: The person did his time.
>
> THE COURT: That person was charged with a drug sale?
>
> [CARLO]: I guess so.
>
> THE COURT: Can I ask you what your relationship to that person was? Was he a relative?
>
> [CARLO]: Boyfriend of my sister's.
>
> THE COURT: How long [ago] was this?
>
> [CARLO]: I think about three years ago.
>
> THE COURT: Three years ago. And that person was arrested and subsequently pled guilty?

---

(...continued)
substantial nature, but not warranting the declaration of a mistrial, the court must discharge such juror.

[CARLO]: I don't know, but he did time.

Thereafter, upon the conclusion of questioning, the prosecutor argued that Carlo should be removed from the jury because she had made false statements under oath. Counsel to the petitioner did not consent to the removal. He stated that he thought Carlo may have wanted to be excused from jury service, but that she had not lied under oath. Referring to the standard set forth in CPL § 270.35, the trial court determined to excuse Carlo as being "grossly unqualified" for jury service because she had made "several misrepresentations" during voir dire.

On April 19, 2000, the jury found the petitioner guilty on all counts. The petitioner was sentenced, as a second felony offender, to concurrent terms of five to ten years imprisonment on each count. Thereafter, petitioner appealed from the judgment of conviction to the New York State Supreme Court, Appellate Division, First Department. The petitioner claimed that his constitutional rights to due process and equal protection were violated by the court's erroneous decision to deny his Batson challenge with respect to Calderone. Petitioner also maintained that his right to a trial by jury, as guaranteed by the New York Constitution, was violated by the trial court's improper removal of a sworn juror from the panel over the objection of his counsel.

The Appellate Division affirmed the judgment of conviction unanimously. See People v. Hall, 292 A.D.2d 166, 738 N.Y.S.2d 206 (App. Div. 1st Dep't 2002). With respect to petitioner's application pursuant to Batson, the Appellate Division found that it was properly denied by the trial court. In reaching this conclusion, the court found that "[t]he record supports the [trial] court's finding that the prosecutor's demeanor-based explanation for challenging the juror in question was not pretextual, a finding that is entitled to great deference." Id. at 166-67, 206 (citing People v. Garraway, 284 A.D.2d 262, 726 N.Y.S.2d 846 [App. Div. 1st Dep't 2001]). The Appellate Division also held that the trial court had properly dismissed juror Carlo on the

ground that she had "failed to disclose a medical condition that had an impact on her ability to concentrate and . . . had also failed to disclose her sister's boyfriend's drug-related conviction and the fact that its similarity to the case on trial was causing emotional distress affecting her ability to serve." Id. at 167, 206.  The New York Court of Appeals denied petitioner's application for leave to appeal on June 24, 2002.  See People v. Hall, 98 N.Y.2d 676, 746 N.Y.S.2d 465 (2002).  The instant application for a writ of habeas corpus followed.

### III.  DISCUSSION

*Batson* Challenge

"A petitioner in custody pursuant to a judgment of a state court is entitled to habeas relief only if he can show that his detention violates the United States Constitution or federal law or treaties of the United States." Acosta v. Giambruno, 326 F. Supp. 2d 513, 518 (S.D.N.Y. 2004) (citing 28 U.S.C. § 2254[a]).  In this case, the petitioner alleges, inter alia, that his detention violates the United States Constitution because the trial court denied erroneously his Batson challenge.

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Batson, 476 U.S. at 89, 106 S. Ct. at 1719.  "[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." Id. at 96, 1723.

Typically, a prima facie case of purposeful discrimination is established as follows: first, the defendant must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire panel members of the

defendant's race;[5] second, the defendant is entitled to rely on the indisputable fact that peremptory challenges are a jury selection practice which permits discrimination on the part of those who are of a mind to discriminate; and third, the defendant must show that these facts, and any other relevant circumstances, raise an inference that the prosecutor has used peremptory strikes to exclude venire members from a petit jury on account of race.  See id.

"[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two)."  Purkett v. Elem., 514 U.S. 765, 767, 115 S. Ct. 1769, 1770-71 (1995).  "At this step of the inquiry, the issue [for the trial court] is the facial validity of the prosecutor's explanation."  Hernandez v. New York, 500 U.S. 352, 360, 111 S. Ct. 1859, 1866 (1991).  In the Second Circuit, before a trial court moves to step three in its Batson analysis, the opponent of the peremptory strike must expressly indicate an intention to pursue the Batson claim.  The opponent of a peremptory strike may demonstrate his or her intention to pursue the Batson claim by a motion for a mistrial, a motion to reinstate excluded jurors, or by some other means that manifests a continuing objection.  If the opponent fails to respond to the prosecutor's explanation, the failure is deemed an indication to the court that the opponent acquiesces in the explanation, and the court need not move further with the inquiry.  See United States v. Rudas, 905 F.2d 38, 41 (2d Cir. 1990).

If the prosecutor tenders a race-neutral explanation, the trial court must then decide (step three) whether the opponent of the strike has proven purposeful discrimination.  See Purkett, 514 U.S. at 767, 115 S. Ct. at 1770-71.  It is at this third step in the Batson analysis that the persuasiveness of the prosecutor's justification becomes relevant.  See id. at 768, 1771.  The

---

[5] In Powers v. Ohio, 499 U.S. 400, 111 S. Ct. 1364 (1991), Batson was extended to permit an objection to be made predicated on the exclusion from the venire panel of members of racial groups different from that of the defendant.

decisive question for the trial court at the third step in the procedure is whether the prosecutor's race-neutral explanation for a peremptory strike should be believed. See Hernandez, 500 U.S. at 365, 111 S. Ct. at 1869. In making this determination, the trial court evaluates the prosecutor's state of mind based on the prosecutor's demeanor and credibility. See id. (citing Wainwright v. Witt, 469 U.S. 412, 428, 105 S. Ct. 844, 854 [1985]). The trial court's decision on the question of the prosecutor's discriminatory intent constitutes a finding of fact. Therefore, a reviewing court must accord it great deference. See id. at 364, 1868-69.

Where a state court has adjudicated the merits of a claim raised in a federal habeas corpus petition, 28 U.S.C. § 2254 informs that a writ of habeas corpus may issue only if the state court's adjudication resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C. § 2254(d); see also Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000); Francis S. v. Stone, 221 F.3d 100 (2d Cir. 2000). In addition, when considering an application for a writ of habeas corpus by a state prisoner, a federal court must be mindful that any determination of a factual issue made by a state court is to be presumed correct and the habeas corpus applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

In this case, the Appellate Division decided Hall's Batson challenge on the merits. Therefore, in considering whether Hall is entitled to habeas corpus relief on his Batson claim, the Court must determine whether the state court's resolution of this claim comports with federal law as established by Supreme Court precedent. Thus, the threshold question under the federal habeas corpus statute is whether the petitioner seeks to apply a rule of law that was clearly

established at the time his state court conviction became final.  See Williams, 529 U.S. at 390,

120 S. Ct. at 1511.  In this case, the petitioner seeks to apply a rule of law established by the

Supreme Court more than a decade before his trial commenced.  That rule of law provides that

the Equal Protection Clause of the Constitution bars a prosecutor from using race-based

peremptory challenges to exclude prospective jurors from being seated as sworn members of a

petit jury.  Therefore, Hall has surmounted the initial hurdle that must be overcome before his

habeas corpus petition may be entertained in this court.

The first step of the Batson analysis requires that a defendant make a prima facie

showing that the prosecutor has exercised a peremptory strike on the basis of race.  In this case,

it was established at trial that Hall is a member of a cognizable racial group.[6]  Additionally, Hall

relied on the fact that peremptory challenges are a jury selection practice that permits those to

discriminate who are of a mind to discriminate.  Moreover, counsel to the petitioner asserted that

the circumstances raised an inference of racial discrimination insofar as the prosecutor had used

peremptory strikes to exclude the only two Hispanic females on the panel.

As noted, the record in this case does not indicate the ethnicity of either Cabrera or

Calderone.  In addition, as the trial court noted, there may have been more than two Hispanic

individuals on the venire panel.  Thus, although a pattern of strikes against minority jurors may

be sufficient to raise an inference of racial discrimination, see Batson, 476 U.S. at 97, 106 S. Ct.

1723, it cannot be determined with certainty whether such a pattern existed in this case.

Consequently, there is no evidence that Hall is entitled to avail himself of an inference of racial

---

[6] A review of the trial transcript reveals that Officer Thomas, during cross-examination, testified that the defendant was "a black male wearing a red jacket and blue jeans."

discrimination. Furthermore, it is unclear whether the trial court in this case actually ruled on the question of whether the petitioner made a prima facie showing of discrimination.[7]

However, even assuming that Hall failed to make such a showing, and notwithstanding the ambiguity of the trial court's statement in this regard, such a "departure from the normal course of proceeding" is not dispositive. Hernandez, 500 U.S. at 359, 111 S. Ct. at 1866. This is so because the issue of whether a defendant has made a prima facie case of discrimination becomes moot "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination." Id.

At the second step of a Batson inquiry, the proponent of the strike must come forward with a race-neutral explanation. At this step, "the issue is the facial validity of the prosecutor's explanation." Id. at 360, 1866. In order to determine the facial validity of a proffered reason at this second step of the inquiry, the trial judge must decide whether there is a discriminatory intent inherent in the explanation provided by the prosecutor. See id.

As noted above, with respect to Cabrera, the prosecutor explained that he had sought to exclude her from the jury because she had said, in response to questioning, that she was afraid of convicting the wrong person. As for Calderone, the prosecutor's avowed reasons for attempting to exclude her were that: (i) she was single and had no children, (ii) her answers to his questions were given hesitantly, and (iii) he had made "a gut call in striking her."

---

[7]As discussed earlier, after counsel to the petitioner had raised his Batson challenge and the prosecutor had offered to be heard on the issue, the trial judge directed the prosecutor to offer a race-neutral explanation for each juror he sought to exclude. The prosecutor, undertaking what may be construed as an attempt to bring to the court's attention the petitioner's obligation, under Batson, to present a prima facie case of discrimination, stated that it was his "understanding" that the defense was required to "la[y] out a proper foundation." To this, the trial judge responded only that counsel had offered "as a reason," that Cabrera and Calderone were the "only two Hispanics in the first 12."

The Court need not determine whether the prosecutor's reason for striking Cabrera was race-neutral because, as noted earlier, the petitioner withdrew his Batson challenge with respect to Cabrera at this stage in the proceedings.  However, petitioner reasserted his challenge with respect to Calderone.

The marital status of a prospective juror is considered a race-neutral fact that may be taken into account during jury selection.  See United States v. Hunter, 86 F.3d 679, 683 (7th Cir. 1996).  It should be noted, in this context, that approximately nine jurors examined during the first round of voir dire also reported being single with no children, yet were not subject to a peremptory challenge.  Where there is a "similarity between the characteristics of jurors struck and jurors accepted," and "the principal difference between them is race, the credibility of the prosecutor's explanation is much weakened."  Jordan v. Lafevre, 206 F.3d 196, 201 (2d Cir. 2000).  Thus, the fact that Calderone shared characteristics with other jurors who were not struck may be construed as lending support to the conclusion that there was purposeful discrimination in the decision to challenge her.  However, because the record does not clearly indicate the race of the jurors who were examined during the first round of voir dire, such a conclusion cannot be reached with certainty.

Furthermore, the prosecutor's subjective evaluation of Calderone's demeanor - his impression that Calderone "seemed to hesitate" as though "wondering what she should say" - and his reliance upon his "gut feeling" in challenging Calderone, constituted valid, race-neutral reasons for excluding her by means of a peremptory challenge.  See J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 148, 114 S. Ct. 1419, 1431 (1994) (O'Connor, J., concurring)(observing that a "trial lawyer's judgments about a juror's sympathies are sometimes based on experienced hunches and educated guesses"); Brown v. Kelly, 973 F.2d 116, 121 (2d Cir. 1992) ("An

impression of the conduct and demeanor of a prospective juror during the <u>voir dire</u> may provide a legitimate basis for the exercise of a peremptory challenge"); <u>Hunter</u>, 86 F.3d at 683 (finding that a "gut feeling" is a valid, race-neutral reason for striking a prospective juror in the absence of evidence of discriminatory intent).

The trial court credited the state's explanations and found no discriminatory intent on the prosecutor's part in exercising his peremptory strikes. Since a trial judge is in the best position to observe demeanor and to assess the credibility of the party exercising the peremptory strikes and, furthermore, given that the trial court's factual determinations are presumed to be correct and are to be accorded great deference by a reviewing court, <u>see</u> <u>Hernandez</u>, 500 U.S. at 364, 111 S. Ct. at 1868-1869, in order to obtain habeas corpus relief, Hall must demonstrate, by clear and convincing evidence, that the finding in the state courts of an absence of purposeful discrimination on the part of the prosecutor was incorrect. <u>See</u> 28 U.S.C. § 2254(e)(1). In addition, Hall must show that "the corresponding factual determination was 'objectively unreasonable' in light of the record before the court." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 348, 123 S. Ct. 1029, 1045 (2003).

Having considered the record as a whole, the Court finds that Hall has not made any showing to establish that the decision by the trial court, and by extension the Appellate Division, on his <u>Batson</u> challenge was: (1) contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The trial court applied the correct analytical procedure in making its determination, allowing a full record to be developed and providing "a meaningful inquiry into the question of discrimination." <u>Jordan</u>, 206 F.3d at 201. Moreover, Hall has failed to present to the Court anything from which it might find

a <u>Batson</u> violation or any evidence, let alone clear and convincing evidence, to rebut the presumption of correctness that attaches to the state courts' determination that, in exercising his peremptory challenges, the prosecutor did not act with discriminatory intent. Under the circumstances, Hall is not entitled to the relief he seeks with respect to this claim.

*Replacement of Juror Carlo*

Petitioner claims that the trial court improperly denied him the right to have a voice in choosing his jury when it removed a sworn juror over the objection of his trial counsel. Petitioner maintains that the juror in question, who informed the trial court that she was taking medication for diabetes and that she had previously been involved with a case involving a controlled substance, never stated that she could not be fair and impartial. Respondent contends that this claim is unexhausted, but should be deemed exhausted and procedurally barred.

A.    *Exhaustion*

"[A] state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971). This requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." <u>Coleman v. Thompson</u>, 501 U.S. 722, 731, 111 S. Ct. 2546, 2254 (1991).

To satisfy the exhaustion requirement, a habeas corpus petitioner must meet a two-pronged test. First, the petitioner must "fairly present" his or her federal claim to the highest state court from which a decision can be rendered. <u>Daye v. Attorney Gen. of N.Y.</u>, 696 F.2d 186, 190-91 n.3 (2d Cir. 1982)(*en banc*). A claim is "fairly presented" if the state courts are informed of "both the factual and the legal premises of the claim [asserted] in federal court." <u>Id.</u>

at 191.  Second, "having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure state [appellate] review of the denial of that claim."  Klein v. Harris, 667 F.2d 274, 282 (2d Cir. 1981)(citations omitted).

A state defendant may alert a state court to the federal constitutional nature of his claim in a number of ways, including:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Daye, 696 F.2d at 194.

In this case, although Hall raised his claim in the highest court in the state, he failed to present the claim in such a way as to implicate a federal constitutional issue.  In the portion of his brief to the Appellate Division that was devoted to the issue of the removal of Carlo from the jury, Hall failed to cite a single federal case, as required by the first Daye factor set forth above. Furthermore, the Court has examined the state cases that were relied upon by the petitioner and finds that none employed a federal constitutional analysis.  Additionally, although petitioner's brief contains a reference to "a constitutional right to a trial by jury," suggesting that petitioner has asserted his claim in terms "so particular as to call to mind a specific right protected by the Constitution," the authority invoked in support of the assertion of his claim is the New York Constitution.  Therefore, it does not appear that petitioner has adequately put the state courts on notice that they are to decide a federal constitutional claim. Consequently, petitioner has not met the requirement set forth in the third Daye factor discussed above.  Finally, petitioner has not alleged "a pattern of facts that is well within the mainstream of constitutional litigation," as

required by the fourth <u>Daye</u> factor. Moreover, by citing to CPL § 270.35, a provision of New York's Criminal Procedure Law, Hall reinforced further the state law basis for his claim. In addition, in his letter seeking leave to appeal to the New York Court of Appeals, Hall again referred to state law in asserting that the trial court erred in excusing a sworn juror. Therefore, this claim is unexhausted under the applicable standard.

       B.    *Procedural Default*

Even if a claim has not been exhausted fully, it will be deemed exhausted if it is clear that the state court would find it procedurally barred. <u>See</u> <u>Harris v. Reed</u>, 489 U.S. 255, 263 n.9, 109 S. Ct. 1038, 1043 n.9; <u>Spence v. Superintendent, Great Meadow Correctional Facility</u>, 219 F.3d 162, 170 (2d Cir. 2000). Under New York law, a defendant is permitted only one opportunity to appeal to the New York Court of Appeals. <u>See</u> N.Y. Ct. Rules § 500.10(a). In this case, Hall cannot seek leave to appeal his claim to the New York Court of Appeals because he has already made the one request for leave to appeal to which he is entitled. Therefore, his claim may be deemed exhausted. Moreover, Hall's inability to return to state court constitutes an independent and adequate state ground upon which his claim is procedurally defaulted. Therefore, Hall is precluded from seeking federal habeas corpus relief on this claim unless he can demonstrate cause for the default and actual prejudice or a fundamental miscarriage of justice. <u>See</u> <u>Coleman</u>, 501 U.S. at 749-750, 111 S. Ct. 2564-2565. In determining if cause is present for the procedural default, courts must be careful to limit their inquiry to external factors that inhibited petitioner, or petitioner's counsel, from asserting the claim. <u>See</u> <u>Murray v. Carrier</u>, 477 U.S. 478, 492, 106 S. Ct. 2639, 2648 (1986) ("[C]ause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim.").

Hall has not presented any evidence to the Court that demonstrates cause for his default or prejudice resulting therefrom. Hall is also unable to persuade the Court that finding his claim procedurally defaulted will result in a fundamental miscarriage of justice. In order to establish this, Hall must prove that he was actually innocent of the crime for which he was convicted. See Murray, 477 U.S. at 496, 106 S. Ct. at 2649. Nothing in the record before the Court supports this conclusion. Therefore, Hall is not entitled to habeas corpus relief on this claim.

## IV.  RECOMMENDATION

For the reasons set forth above, the instant application for a writ of habeas corpus should be denied.

## V. FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also, Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Kenneth M. Karas, 500 Pearl Street, Room 920, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 540, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Karas. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. See Thomas v. Arn, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir.

1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d

55, 57-59 (2d Cir. 1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
      May 5, 2005

Respectfully submitted,

_/Cevin Nathaniel Fx/_
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

Copies mailed to:

Denam Hall
# 00-R-2891

Luke Martland
Assistant Attorney General



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/5/05